UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FOLUKE OWOEYE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:14-cv-664 (VLB) |
| | : | |
| STATE OF CONNECTICUT and | : | |
| DEPARTMENT OF MENTAL HEALTH | : | |
| AND ADDICTION SERVICES, | : | December 23, 2016 |
| | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. 60]

I.    **Introduction**

Plaintiff Foluke Owoeye, a former employee of Defendant Department of Mental Health and Addiction Services ("DMHAS"), brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*  Ms. Owoeye alleges that she was (1) terminated based on her race, color, ethnicity, or national origin; (2) terminated in retaliation for filing a complaint of discrimination on these bases; and/or (3) subjected to a hostile work environment.  For the reasons that follow, Defendants' Motion for Summary Judgment [Dkt. 60] is GRANTED.

II.    **Background**

A.    **Procedural History**

On March 13, 2013, Plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities, claiming that she was discharged on the basis of her race, color, national origin, and ancestry.  [*See*

1

Dkt. 66-5].  She filed her complaint in this Court on May 9, 2014.  [*See* Dkt. 1].

Defendants filed a Motion to Dismiss on July 1, 2015.  [See Dkt. 24].  After

numerous disputes and delays relating to Plaintiff's failure to diligently prosecute

this case, [*see, e.g.*, Dkts. 41, 45], the Court dismissed all of Plaintiff's claims

except for her Title VII claim, [*see* Dkt. 54 at 13].

Defendants filed the instant Motion for Summary Judgment on May 27,

2016.  [*See* Dkt. 60].  On the day that Plaintiff's opposition was due, Plaintiff's

counsel filed a Motion for Extension of Time without making the requisite

showing of good cause required by Local Rule of Civil Procedure 7(b).  [*See* Dkt.

62].  The Court denied this motion, and stated that Defendants' summary

judgment motion would be considered unopposed (as no opposition was filed by

the deadline), [*see* Dkt. 63], reversing course after the Second Circuit ordered

expedited briefing on the issue, [*see* Dkt. 65].  Plaintiff's opposition was finally

filed on July 20, 2016, with Defendants' reply filed on July 29, 2016.  [*See* Dkts. 66,

67].

### B.  The Record on Summary Judgment

"A party asserting that a fact . . . is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or

declarations, stipulations, admissions, interrogatory answers, or other materials."

Fed. R. Civ. P. 56(c)(1).  A party may also support their assertion by "showing that

the materials cited do not establish the absence . . . of a genuine dispute."  *Id.*

Cited documents must consist of either "(1) the affidavit of a witness competent

to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4).

"The principles governing admissibility of evidence do not change on a motion for summary judgment."  *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 395 (D. Conn. 2008), *aff'd*, 587 F.3d 132 (2d Cir. 2009) (quoting *Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 75 (D. Conn. 2004)).  "[D]ocuments submitted in opposition to a summary judgment motion must be properly authenticated in order to be considered by the court at summary judgment stage."  *Barlow v. Connecticut*, 319 F. Supp. 2d 250, 257 (D. Conn. 2004), *aff'd sub nom.*, *Barlow v. Dep't of Pub. Health, Connecticut*, 148 F. App'x 31 (2d Cir. 2005); *see also Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 391 (S.D.N.Y. 2005) ("[P]roper admission requires a determination on relevance and authenticity.").

If no objection to a document's authenticity has been raised, the Court may exercise its discretion to consider documents that have not been properly authenticated.  *H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454 (2d Cir. 1991); *see also Delgado v. City of Stamford*, No. 3:11-CV-01735-VAB, 2015 WL 6675534, at *5 n.3 (D. Conn. Nov. 2, 2015) ("[T]he court has the discretion to consider unauthenticated or otherwise objectionable evidence where it is apparent that the party may be able to authenticate and establish the admissibility of those documents at trial."); Charles A. Wright & Arthur R. Miller, et al., 10A Fed. Prac. & Proc. Civ. § 2722 (2016) ("[D]ocuments inadmissible under the evidence rules may be considered by the court if not challenged.")  However, the Court may also

3

correct evidentiary errors on its own initiative.  *See Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) (holding that the rule allowing courts to consider unobjected-to evidence is permissive rather than mandatory); *see also United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985) (stating that if counsel "pursues an objectionable line of questioning, he can hardly cry 'foul' when the judge . . . excludes the testimony *sua sponte*.").  Therefore, while Defendants have raised only vague objections to the evidence Plaintiff has offered, [*see* Dkt. 67 at 2], the Court may exercise its discretion to exclude inadmissible evidence.

The exhibits to Plaintiff's opposition are deficient in numerous respects. They include (1) what appears to be text copied from a deposition transcript and pasted into a new document that not only lacks page and line numbers, but also lacks any authenticating signatures or declarations [*see* Dkt. 66-3]; (2) interrogatory responses that lack Plaintiff's signature [*see* Dkt. 66-4]; (3) the affidavit of illegal discriminatory practice that Plaintiff filed with the Connecticut Commission on Human Rights and Opportunities [*see* Dkt. 66-5]; and (4) various documents apparently related to Ms. Owoeye's employment for which the Court has been provided no context [*see* Dkt. 66-6].  Exhibits 1 and 2 are inadmissible on summary judgment because they do not bear authenticating signatures and lack any other indicia of reliability.  Exhibit 3 appears to be a verified complaint that is admissible as on summary judgment to the extent it is made on personal knowledge, sets out facts that would be admissible in evidence, and shows that Ms. Owoeye is competent to testify on the matters asserted in the complaint.  *See* Fed. R. Civ. P. 56(c)(4); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A

verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e).").  Some of the documents contained within Exhibit 4 also appear to bear some indicia of reliability that might counsel against exclusion, but many of these documents appear to be of little relevance to the questions presented on summary judgment.  This problem is exacerbated by Plaintiff's counsel's failure to cite Exhibits 3 and 4 anywhere in Plaintiff's brief or Rule 56(a) statement.

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may "consider the fact undisputed for purposes of the motion [and] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e); *see also* Local R. 56(a)3 ("[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)1 or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law.").[1]  Because Plaintiff's Rule 56(a) statement cites only the inadmissible

---

[1] While Rule 56(e) also permits the Court to give a party the "opportunity to properly support or address the fact," such a course of action is not warranted.

Exhibits 1 and 2, the Court is not obligated to consider any of the facts Plaintiff asserts in that document.  However, the Court has nevertheless considered facts asserted in Plaintiff's Rule 56(a) where they are supported by admissible evidence elsewhere in the record.

### C. Factual Background

Ms. Owoeye worked as a registered nurse ("RN") in the Clinical Neuroscience Research Unit ("CNRU") of the Connecticut Mental Health Center ("CMHC") from March 23, 2013 to September 17, 2012.  [Dkt. 60-4, March 10, 2016 Deposition of Foluke Owoeye ("Owoeye Dep.") at 34, 52, 250].  The CNRU consists of a 12-bed residential inpatient unit and five specialty outpatient clinics, which offer interventions for obsessive compulsive disorder, depression, schizophrenia, and cocaine addiction.  [Dkt. 60-6, April 22, 2016 Affidavit of Carolyn Cochran-Dintner ("Cochran-Dinter Aff.") ¶ 8].

---

Plaintiff's counsel repeatedly has failed to diligently pursue this case.  [*See, e.g.*, Dkts. 11-16 (evidencing Plaintiff's failure to serve the Defendants until more than year after the complaint was filed); Dkts. 40, 41, 45, 53 (ordering sanctions for Plaintiff's failure to provide discovery responses or respond to Defendants' motion to compel within the applicable deadlines); Dkts. 62-63 (noting that counsel did not file Plaintiff's opposition to summary judgment by the applicable deadline, and failed to demonstrate good cause for extending the deadline to object)].  Despite having a full 54 days to draft Plaintiff's opposition, the brief is rife with errors.  For example, even though Ms. Owoeye is Nigerian, the opposition states, "[T]he Plaintiff has undisputably offered direct evidence that plaintiff's Hispanic heritage was the motivating factor for defendant's conduct." [Dkt. 66-1 at 36].  The brief also references "fellow Hispanic workers" and refers to Ms. Owoeye's position as "his employment."  [*See id.*].  Plaintiff's counsel also appears to have cut and pasted the same paragraph into two separate sections of the brief.  [*Compare* Dkt. 66-1 at 21 *with* Dkt. 66-1 at 36].  Under these circumstances, the Court has little confidence that counsel will produce a brief that comports with Rule 56's requirements if given the opportunity to do so.

1. **Job Responsibilities and Training**

As an RN in the SNRU, Ms. Owoeye's responsibilities included:  (1) collaborating with attending physicians and multidisciplinary teams to plan treatments and provide direct care to patients; (2) writing nursing notes in patient charts; (3) transcribing medical orders onto the "kardex" medical information system; (4) dictating reports on patients for upcoming shifts; (5) completing admissions with comprehensive initial nursing assessment for patients with acute psychiatric and addictive problems; (6) maintaining safety of patients who are at imminent risk to themselves or others, including from potential or actual substance withdrawal; (7) describing nursing care needs or problems; (8) administering medications in accordance with CMHC standards of practice and nursing policies and procedures; (9) providing treatment to patients in double blind placebo controlled studies; and (10) after demonstrating competence, drawing blood, initiating intravenous therapy, and performing electrocardiograms.  [Dkt. 60-8, Exh. B to Owoeye Dep.; Cochran-Dinter Aff. ¶ 15]. RNs in the CNRU must demonstrate competency in each of these duties and responsibilities during a training orientation before they may work without supervision, and before they may be considered full members of the CNRU staff. [Cochran-Dinter Aff. ¶ 16].

According to the employee handbook, the "CMHC Nursing Policy and Procedure Manual," this orientation averages six weeks, but may be extended if a new employee experiences difficulty.  [Dkt. 60-10, Exh. F to Owoeye Dep.; Dkt. 60-7, April 22, 2016 Affidavit of Rebecca O. Wetteman ("Wetteman Aff.") ¶ 25;

Cochran-Dinter Aff. ¶ 17].  Ms. Owoeye received a copy of the handbook on April 13, 2012.  [Owoeye Dep. at 61; Dkt. 60-9, Exh. E to Owoeye Dep.].

During an employee's orientation, a supervisor or other designee evaluates the employee's ability to fulfill job responsibilities and completes an orientation checklist.  [Dkts. 60-9, 60-10, Exhs. E-F to Owoeye Dep.; Cochran-Dinter Aff. ¶¶ 19-20; Wetteman Aff. ¶¶ 27-28].  In addition, preceptors keep the nurse manager and other supervising nurses apprised of the employee's progress throughout the orientation.  [Dkt. 60-10, Exh. F to Owoeye Dep.; Cochran-Dinter Aff. ¶ 21; Wetteman Aff. ¶ 29].  At the end of the orientation, the employee is expected to demonstrate completion of all clinical competencies necessary to perform her role.  [Dkts. 60-9, 60-10, Exhs. E-F to Owoeye Dep.; Cochran-Dinter Aff. ¶ 19].

Ms. Owoeye began her orientation in the CNRU on April 2, 2012 and substantially completed it on June 27, 2012.  [Dkt. 60-9, Exh. E to Owoeye Dep., Cochran-Dinter Aff. ¶ 23].  During her orientation, she attended mandatory training sessions, passed the mandatory Medication Administration Test, and was taught how to complete (1) daily charts (2) a handoff report/shift to shift report; (3) medical orders; (4) patient kardex; and (5) admission and discharge paperwork.  [Dkt. 60-9, Exh. E to Owoeye Dep., Cochran-Dinter Aff. ¶ 27].  She did not complete the blood draws component of the orientation until August 13, 2012. [Dkt. 60-9, Exh. E to Owoeye Dep.; Cochran-Dinter Aff. ¶¶ 23, 27].

During her orientation, Ms. Owoeye was assigned several preceptors, including Colleen Kereljza, Linda Wheaton, Sue Keleman-Pfistner, Dottie Arovich, Marta Cahill, Schelia Zayas, and Jane Wanyiri.  [Owoeye Dep. at 63-65, 238;

8

Cochran-Dinter Aff. ¶ 24; Wetteman Aff. ¶ 33].  Ms. Kereljza, Ms. Keleman-Phister, and Ms. Arovich are non-Hispanic white women, Ms. Cahill and Ms. Zayas are Hispanic women, and Ms. Wanyiri is a black woman.  *Id.*  Plaintiff did not dispute this, [*see* Dkt. 66-2 at 2 (admitting Dkt. 60-2 ¶ 19)], despite stating during her deposition that she was the only black nurse in her unit, and that all of the other nurses were white,  [Owoeye Dep. at 102].

2. <u>Difficulty Meeting Orientation Expectations</u>

After Ms. Owoeye's first month of employment, Defendants claim that she appeared to have difficulty retaining information covered in training, that she failed to ask questions when she did not understand something, that she did not perform required safety checks on the patients every 30 minutes, and was not answering phones or undertaking in other unit management tasks.  [Cochran-Dinter Aff. ¶ 32].  Defendants also claim that Plaintiff had difficulty with simple tasks relating to kardex entries, despite the efforts of Plaintiff's preceptors to show Plaintiff her mistakes and explain how the entries should read.  [Owoeye Dep. at 187-92; Cochran-Dinter Aff. ¶¶ 36-41].  Some of the mistakes Defendants claim Plaintiff made include entering incorrect dates, missing a zero in a patient identification number or mixing up "AM" and "PM" when writing the time medication should be administered.  [Owoeye Dep. at 157-58, 187-92; Cochran-Dinter Aff. ¶ 36].  Ms. Cochran-Dinter described some of these issues in her "supervision notes" as early as April 26, 2012.  [Cochran-Dinter Aff. ¶ 95; Dkt. 60-16, Exh. V to Owoeye Dep.].  Defendants claim that they extended Ms. Owoeye's orientation period beyond the standard 6-week period based on these

9

performance related issues.  [Cochran-Dinter Aff. ¶¶ 39-40].  Plaintiff disputed all of these facts, but failed to cite any record evidence in support of her position.  [*See* Dkt. 66-2 at 3 (disputing Dkt. 60-2 ¶¶ 25, 27-30, 32, but citing no record evidence that supports this position)].

Plaintiff did not dispute that a kardex listing inaccurate dosage, patient information, start/end date for medication, and incomplete instructions on how to give the medications could be life threatening to patients or could compromise the CNRU's research.  [Dkt. 66-2 at 3 (admitting Dkt. 60-2 ¶ 31); *see also* Owoeye Dep. at 71, 227; Cochran-Dinter Aff. ¶ 42].  Plaintiff blamed these errors on others—she argued that she was often given incorrect medication orders, and that she was not properly trained on medication room duties.  [*See* Dkt. 60-15, Exh. P to Owoeye Dep.].  She also said separately that she "did everything [she] was supposed to do," with respect to her medication room duties but failed to elaborate.  [Owoeye Dep. at 136].

### 3.  Allegedly Discriminatory Comments

During her deposition, Ms. Owoeye agreed that it was important for coworkers to understand oral reports that she had to give about patients during shift changes.  [Owoeye Dep. at 127].  Defendants claim, and Plaintiff has offered no evidence to rebut, that these oral reports were "a very important aspect of the nurses' duties because the passing of information between the staff members ensures patient safety and the accuracy of the research.  It is thus very important that the reports are accurate, clearly communicated and understood by the recipient."  [Cochran-Dinter Aff. ¶ 47].

Defendants claim that by May 17, 2012, Ms. Cochran-Dinter had received complaints that Ms. Owoeye's oral reports were confusing and hard to understand.  In response, Ms. Cochran-Dinter claims to have asked the Plaintiff to "speak clearly so everyone could understand her."  [Cochran-Dinter Aff. ¶ 48]. She also discussed, and gave Plaintiff materials regarding, the information that should be included in an oral report.  [Cochran-Dinter Aff. ¶ 48].  Plaintiff claims that during this interaction, Ms. Cochran-Dinter told her that "people can't understand me because of my accent."  [Owoeye Dep. at 124].  Despite disputing that "no one else at CMHC made any comment to the Plaintiff regarding her accent" in her Rule 56(a) statement, [*see* Dkt. 66 at 3 (disputing Dkt. 60-2 ¶¶ 34-35)], Plaintiff agreed during her deposition that "nobody else other than [Ms. Cochran-Dinter] ever made a comment about [her] accent."  [Owoeye Dep. at 129].

In addition to Ms. Cochran-Dinter's comments, Plaintiff offered evidence that on her first day on the job, unnamed "other nurses" told Plaintiff:

- "[T]his is not your job.  You are going to screw up our research"
- "[H]ow did you find out about this job?"
- "Did you apply on the internet?"
- "Did you mail in your application?"
- "How can you know what we do here?"
- "Who interviewed you?"
- "You belong on the 4th Floor."
- "We did not ask for somebody like you." [Dkt. 66-4 ¶ 8]

Plaintiff did not identify these nurses, and offered no evidence regarding their racial composition, job titles, or what if any supervisory authority they may have had over Plaintiff.

### 4. Affirmative Action Complaints and Post-Orientation Performance Issues

On May 18, 2012, shortly after Ms. Cochran-Dinter commented on Ms. Owoeye's accent or oral communication skills, Ms. Cochran-Dinter had a "frank conversation" with the Plaintiff, during which she emphasized that the CNRU was a difficult place to work, and asked Plaintiff to spend the following weekend thinking about whether she wanted to continue working at the CNRU.  [Owoeye Dep. at 136; Cochran-Dinter Aff. ¶ 51].  On the same day, Plaintiff filled out an internal complaint of discrimination, which she sent to Defendants' affirmative action office on May 21, 2012.  [Dkts. 60-13, 60-14, 60-15, Exhs. N, O, and P to Owoeye Dep.].  Plaintiff received her first performance evaluation on May 28, 2012, in which Ms. Cochran-Dinter gave Plaintiff a service rating of "unsatisfactory," based on her belief that Plaintiff struggled with every aspect of the job and was still in orientation even though the standard 6-week period had expired.  [Dkt. 60-19, Exh. FF to Owoeye Dep.; Cochran-Dinter Aff. ¶¶ 63-65)].

Ms. Cochran-Dinter claims that even after Plaintiff completed her orientation, she still displayed serious performance issues.  [Cochran-Dinter Aff. ¶¶ 70-79].  In particular, in August 2012, two nurses supervising Plaintiff complained that Plaintiff had failed to complete physical safety checks on patients under her supervision.  [Owoeye Dep. at 237-38; Dkt. 60-17, Exh. CC to Owoeye Dep.; Cochran-Dinter Aff. ¶¶ 74-77; Wetteman Aff. ¶¶ 36-39].  Defendants'

human resources department conducted an investigation, which appears to have consisted of obtaining statements from Plaintiff and her coworkers and supervisors regarding the alleged failure to conduct safety checks.  [Dkt. 60-17, Exh. CC to Owoeye Dep.; Cochran-Dinter Aff. ¶ 77; Wetteman Aff. ¶ 39].  The investigation determined that Plaintiff had violated a work rule.  *Id.*  Plaintiff disputed that she had failed to do the safety checks, but offered no evidence in support of her position.  [*See* Dkt. 66-2 at 3 (disputing Dkt. 60-2 ¶¶ 47-49, but citing no record evidence that supports this position)].  In September 2012, one of Plaintiff's coworkers also reported that Plaintiff had given a patient a razor without signing it out.  [Dkt. 60-18, Exh. DD to Owoeye Dep.; Cochran-Dinter Aff. ¶ 79].  Plaintiff agreed in her deposition that it could be dangerous for patients to have sharp objects because of the potential suicide risk, but implied that it was not a big deal to have failed to sign out the razor in this instance because she was "standing right there."  [*See* Owoeye Dep. at 239-240].

Plaintiff filed a second complaint with the affirmative action office on September 4, 2012.  [Dkt. 66-4 ¶ 46; Dkt. 66-6].  On September 17, 2012, Plaintiff received her second "unsatisfactory" service rating, because Defendants claim she continued to make errors in transcribing medical orders, showed poor judgment by allowing a razor out in the unit without signing it out or notifying peers that a patient had such an item, and violated patient safety policies.  [Dkt. 60-20, Exh. GG to Owoeye Dep.].  Plaintiff was also officially terminated on September 17, 2017.  [Dkt. 60-21, Exh. HH to Owoeye Dep.].  Defendants claim that CMHC's Director of Nursing, Rebeca O. Wetteman ultimately determined that

Plaintiff should be terminated, and that none of the individuals named in Plaintiff's affirmative action complaint made this determination or even had the authority to make this determination.  [Wetteman Aff. ¶ 42-44].  Ms. Wetteman claims that she found Plaintiff's failure to conduct safety checks unacceptable, and that failure alone would justify Plaintiff's termination.  [Wetteman Aff. ¶ 44].  Plaintiff offered no evidence to rebut these assertions.  [*See* Dkt. 66-2 at 4 (disputing Dkt. 60-2 ¶ 54, but citing no record evidence that supports this position)].

Plaintiff is not aware of any similarly situated white nurses who (1) received two "unsatisfactory" service ratings; or (2) had two work rule violations filed against them, but were not terminated.  [Owoeye Dep. at 251].  Defendants also claim that several other black nurses worked at CMHC, including some African nurses with accents, and Plaintiff testified that she was unaware of any other African American or African nurse who complained of discrimination or harassment at CMHC.  [Owoeye Dep. at 60, 84, 103, 116-19; Wetteman Aff. ¶¶ 11-17].  Plaintiff disputed Defendants' claim that some of the African American or African nurses at CMHC worked directly with Plaintiff, but offered no evidence in support.  [Dkt. 66-2 at 4 (disputing Dkt. 60-2 ¶ 64, but citing no record evidence that supports this position)].

III.  <u>Standard of Review</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of

proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.'  At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting her

claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

IV.   <u>Discussion</u>

Plaintiff claims that she was subjected to disparate treatment on the basis of her membership in a protected class, that her termination was retaliatory, and that she was subjected to a hostile work environment.  Upon review of all facts supported by evidence properly admitted to the record, the Court finds no genuine issues of fact that would preclude summary judgment.

A.   <u>Claims Analyzed Under the *McDonnell Douglas* Framework</u>

Title VII claims for both disparate treatment and retaliation are evaluated using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996). "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz*, 609 F.3d at 491 (citation omitted).  "The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate non-discriminatory reason for the termination." *Ruiz*, 609 F.3d at 492 (citation omitted).  If the defendant offers a legitimate non-discriminatory reason for the termination, "the burden returns to the plaintiff to show that the real reason for plaintiff's termination was [her] race and national origin." *Id.* (citation omitted).

16

1. **Prima Facie Case**

a. **Disparate Treatment**

Title VII makes it unlawful "for an employer . . . to discharge . . . or otherwise to discriminate against any individual . . . because of such individual's race, color . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  To establish a prima facie case of disparate treatment, "a plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491-92 (citation omitted).

The parties do not dispute that Plaintiff is a member of a protected class because she is a black woman who was born in Africa.  [Dkt. 60-1 at 12].  They similarly do not dispute that Plaintiff was qualified for her position, because she was a registered nurse when she applied and was hired for her position.  *Id.* Plaintiff also suffered an adverse employment action when she was terminated. [Cochran-Dinter Aff. ¶ 84; Wetteman Aff ¶ 42; Dkt. 60-1 at 12].  However, only the thinnest evidence supports Plaintiff's assertion that she was terminated under circumstances that give rise to an inference of discrimination.

Evidence giving rise to an inference of discrimination includes (1) the employer's criticism of the plaintiff's performance in ethnically degrading terms; (2) invidious comments about others in the employee's protected group; or (3) the more favorable treatment of employees not in the protected group.  *See Chambers*, 43 F.3d at 37.  "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of

17

discrimination is seldom able to prove [her] claim by direct evidence, and is usually constrained to rely on circumstantial evidence." *Id.*

A plaintiff usually presents a prima facie case by "showing that the employer . . . treated [the employee] less favorably than a similarly situated employee outside [her] protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). The Plaintiff must be "similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Id.* (citations omitted). Here, Plaintiff has agreed that she is unaware of any similarly situated white nurses who received two "unsatisfactory" service ratings or had two work rule violations filed against them, but were not terminated. [Owoeye Dep. at 251]. She similarly has offered no evidence that similarly situated white nurses engaged in the conduct for which Defendants claim she was terminated, but received satisfactory service ratings, or did not have any official work rule violations filed against them. Plaintiff was also unaware of any other black or African nurses who had complained of discrimination or had been subject to disciplinary measures that were not applied to white nurses. [Owoeye Dep. at 103, 116-19].

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham*, 230 F.3d at 39. However, "where a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v.*

*Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *see also Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").  No record evidence suggests that Defendants' treatment of similarly situated employees raises an inference of discrimination.

In the interest of considering the evidence in the light most favorable to Plaintiff, the Court will assume arguendo that Plaintiff accurately interpreted the comments discussed in Section II.C., *supra*.  If true that "somebody like you" refers to someone who is black or African, or that the "other nurses" wanted to find out if their employer knew Plaintiff's race before she was hired, [see Dkt. 66-4 ¶ 8], a reasonable jury might determine that racial prejudice existed in Plaintiff's workplace.  Similarly, a reasonable jury might see prejudice in Ms. Cochran-Dinter's alleged comment that people could not understand Plaintiff's accent. The Court does not believe that either of these determinations necessarily gives rise to an inference that Plaintiff's termination was motivated by discrimination, but will nevertheless proceed to the next stage of the *McDonnell Douglas* analysis with respect to Plaintiff's disparate treatment claim.

### b.  Retaliation

Title VII makes it unlawful for employers to retaliate against employees who oppose employment discrimination, or submit or support a complaint of employment discrimination.  *See* 42 U.S.C. § 2000e-3(a); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532 (2013).  "'To establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known

19

to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'"  *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (quoting *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).

"Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . which require[] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 133 S. Ct. at 2533.  This causal connection "can be shown indirectly by timing:  protected activity followed closely in time by adverse employment action."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).  However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

Plaintiff filed her complaints of discrimination on May 21, 2012 and September 4, 2012.  [Dkts. 60-13, 60-14, 60-15, Exhs. N, O, P to Owoeye Dep.; Dkts. 66-4 ¶ 46; Dkt. 66-6].  Plaintiff also received unsatisfactory performance ratings on May 28, 2012 and September 17, 2012—shortly after she filed each of her complaints.  [*See* Dkts. 60-19, 60-20, Exhs. FF and GG to Owoeye Dep.].  On August 30, 2012, several of Plaintiff's colleagues filed formal complaints regarding Plaintiff's failure to conduct required safety checks.  [*See* Dkt. 60-17, Exh. CC to Owoeye Dep.].  Human resources investigated these complaints and determined on September 11, 2012, that Plaintiff's conduct violated a work rule.

[*See* Dkt. 60-17, Exh. CC to Owoeye Dep.].   A second investigation into a work rule violation began on September 12, 2012.  [Dkt. 60-18, Exh. DD to Owoeye Dep.].[2]  Plaintiff was officially terminated on September 17, 2017.  [Dkt. 60-21, Exh. HH to Owoeye Dep.].  The fact that Plaintiff's final performance evaluations, rule violation investigations, and termination occurred immediately after Plaintiff filed complaints of discrimination creates enough of an inference of retaliation for Plaintiff to establish a prima facie case.

## 2.  Legitimate Non-discriminatory Reason

Defendants have offered numerous legitimate, nondiscriminatory reasons for terminating Plaintiff.  In meeting its burden of articulating a nondiscriminatory reason for taking an adverse employment action, "an 'employer's explanation of its reasons must be clear and specific' in order to 'afford the employee a full and fair opportunity to demonstrate pretext.'"  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 996-97 (2d Cir. 1985)); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981) ("[T]he defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.").  However, "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case.  The defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Paul v. Bank of Am.*, CIV 3:08CV1066J13A, 2010 WL 419405 (D. Conn. Jan. 29, 2010) (quoting *Fisher v. Vassar Coll.*, 114 F.3d

---

[2] **Because these unsatisfactory service ratings and rule violations were used as justification for Plaintiff's termination, [*see* Dkt. 60-1 at 20], their timing is relevant to whether Defendants retaliated against Plaintiff.**

1332, 1335–36 (2d Cir. 1997), *abrogated on other grounds*, *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000)); *see also Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) ("The defendant is not required to prove that the articulated reason actually motivated its actions.").

      Defendants offered overwhelming and undisputed evidence that Plaintiff could not competently perform basic job functions, and committed two rule violations that endangered the safety of patients under her care.  [*See* Sections II.B., II.D., *supra*].  They have therefore offered legitimate, nondiscriminory reasons for Plaintiff's dismissal.  The burden, therefore, shifts back to Plaintiff to present "admissible evidence that would be sufficient to permit a rational finder of fact to infer that the employer's proffered reason is pretext for an impermissible motivation."  *See Vivenzio*, 611 F.3d at 106 (quotation and citation omitted).

      3.  Pretext

      Plaintiff has offered no admissible evidence to refute the vast majority of Defendants' claims regarding her poor job performance, or that discrimination or retaliation were motivating factors for her dismissal.

      a.  Disparate Treatment

      "To avoid summary judgment in an employment discrimination case, 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors.'" *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 133 S. Ct. at 2522–

23 ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act.").  Plaintiff may meet her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *See Burdine*, 450 U.S. at 256; *accord Cooper v. Connecticut Pub. Defender's Office*, 480 F. Supp. 2d 536, 545 (D. Conn. 2007), *aff'd sub nom.*, *Cooper v. State of Connecticut Pub. Defenders Office*, 280 Fed. Appx. 24 (2d Cir. 2008).  Conclusory and unsupported assertions that an employer's proffered race-neutral reason was a pretext for discrimination may support a grant of summary judgment in favor of the employer.  *See, e.g.*, *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) ("[I]f the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate").

The comments that Plaintiff believes evidence disparate treatment only do so by virtue of inferential gymnastics much more favorable to Plaintiff than the summary judgment standard requires.  *See Fincher*, 604 F.3d at 726 (holding summary judgment inappropriate where alleged discriminatory remarks "are at best just such a 'scintilla' in light of their offhand, conclusory nature and the lack of further support in the record for [the plaintiff's] claim").  Further, Plaintiff has offered no evidence regarding the identities of the "other nurses" who allegedly made derogatory comments, whether they played any role in Plaintiff's

termination, or whether they exercised any supervisory authority over Plaintiff. The comments therefore cannot give rise to an inference of discrimination in Plaintiff's termination, which was authorized by Ms. Wetteman, possibly with some input from Ms. Cochran-Dinter. [*See* Wettman Aff. ¶ 42; Dkts. 66-19, 66-20, 66-21, Exhs. FF, GG, HH to Owoeye Dep.].

Plaintiff also has offered no evidence to support her assertion that Ms. Cochran-Dinter's comment about her accent was motivated by discrimination on the basis of Plaintiff's national origin.  By contrast, copious record evidence suggests that this comment was made because of concerns about Plaintiff's oral communication skills.  [*See* Section II.C.3., *supra*].  "An adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance.  There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." *Vidal v. Metro-N. Commuter R. Co.*, No. 3:12-CV-00248 MPS, 2014 WL 3868027, at *11 (D. Conn. Aug. 6, 2014), *appeal withdrawn*, (Mar. 26, 2015).  Here, Plaintiff has agreed that it was important for coworkers to understand oral reports that she had to give about patients during shift changes.  [Owoeye Dep. at 127].  She also offered no evidence that her oral reports were cogent or easy to understand. Therefore, even if some nexus existed between Ms. Cochran-Dinter's belief that people could not understand Plaintiff's accent and Plaintiff's termination, it would not be evidence that Plaintiff's termination was motivated by anything other than poor job performance.

24

### b.  Retaliation

Although the timing of the events leading up to Plaintiff's dismissal appears at first to suggest that it may have been retaliatory, a full view of the record evidence demonstrates that Plaintiff filed her affirmative action complaints immediately after receiving performance-based criticism from her supervisors. For example, Plaintiff filed her May 2012 complaint on the first business day after Ms. Cochran-Dinter told Plaintiff that she was having difficulty learning how to perform the tasks required of her in the CNRU and suggested that Plaintiff might want to think about resigning.  [*See* Owoeye Dep. at 135-37; Cochran-Dinter Aff. ¶ 51].  Undisputed evidence also shows that Ms. Cochran-Dinter had concerns about Plaintiff's job performance weeks before Plaintiff filed her first complaint. [*See* Cochran-Dinter Aff. ¶¶ 33, 95; Wetteman Aff. ¶ 50].  Similarly, Plaintiff submitted her second complaint two business days after her colleagues formally reported her serious work rule violation to human resources.  [*See* Dkt. 60-17, Exh. CC to Owoeye Dep.; Dkt. 66-6].  While the record evidence suggests that Plaintiff reacted to performance-based criticism by quickly filing discrimination complaints, it does not support Plaintiff's claim that this criticism was pretextual.

### B.  Hostile Work Environment

"'Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986)).  "To prevail on a hostile work environment claim, a plaintiff must demonstrate: '(1) that [her] workplace was permeated with discriminatory

intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Id.* (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996)).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview."  *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993).  A "mere utterance of an epithet which engenders offensive feelings in a[n] employee . . . does not sufficiently affect the conditions of employment to implicate Title VII."  *Id.*

In support of her claim that she was subjected to a hostile work environment, Plaintiff asserts in conclusory fashion that co-workers said negative things about her when she was not around, that she did not feel she was adequately trained, and that she was reprimanded for mistakes that she did not make.  [*See, e.g.*, Dkt. 66-4 ¶¶ 11-29].  While unpleasant, "[h]ostility or unfairness in the workplace that is not the result of discrimination against a protected characteristic is simply not actionable."  *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014).  With the possible exception of the comments discussed in Section II.C.—which are not sufficiently "severe or pervasive" to violate Title VII— Plaintiff has offered no evidence that her perceived mistreatment by Ms. Cochran-Dinter or other co-workers was motivated by racial animus.

V.    **Conclusion**

**For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  The Clerk is directed to close this file.**

**IT IS SO ORDERED.**

**_____/s/_____**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut:  December 23, 2016**